IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROSE M. BYRD,

                                    Plaintiff,                                    OPINION & ORDER

        v.
                                                                                    13-cv-714-jdp

WISCONSIN DEPARTMENT OF
VETERANS AFFAIRS,

                                    Defendant.

---

Plaintiff Rose Byrd worked briefly as an administrative assistant for an agency within defendant Wisconsin Department of Veterans Affairs (DVA). Byrd alleges that during her three weeks at the agency, another employee sexually harassed her by sitting too close to her during training, making inappropriate physical contact with her, and commenting on the way she smelled. DVA denies any harassment and asserts that Byrd was a deficient employee because she did not complete assigned tasks on time, she failed to apply the training that she received, and she misrepresented her position to third parties. DVA fired Byrd less than a month after hiring her. Byrd filed suit in this court under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She alleges quid pro quo sexual harassment, hostile work environment, and retaliation.

DVA has moved for summary judgment on all three claims. Dkt. 53. DVA has also moved to dismiss this case as a sanction for Byrd's discovery violations. Dkt. 68. I will deny DVA's motion to dismiss because, although Byrd has been difficult and uncooperative throughout, her non-compliance is not so severe as to warrant the ultimate sanction of dismissal. I will grant DVA's motion for summary judgment on Byrd's claims for quid pro quo sexual harassment and for retaliation. But Byrd has adduced some evidence to support her hostile work environment claim. Because Byrd did not identify this evidence in her brief, I will give DVA an

opportunity to respond to it before ruling definitively on that claim. For now, however, the parties should assume that this case will go to trial on Byrd's hostile work environment claim.

UNDISPUTED FACTS

Although Byrd was originally represented by an attorney, she is now proceeding pro se, and thus I will give her some leeway in compliance with procedural requirements. Substantively, however, even a pro se plaintiff must cooperate in discovery and she must come forward with admissible evidence to meet a defendant's motion for summary judgment. Byrd's opposition to DVA's motion for summary judgment has the forgivable technical imperfections typical of a pro se litigant, but it is also substantively deficient.

To raise a *genuine* dispute of fact, Byrd must have evidence to support her version. She cannot raise a genuine dispute merely by denying the truth of a fact proposed and supported by DVA. Byrd has failed to genuinely dispute most of DVA's proposed facts, despite receiving a pretrial conference order with directions for how to do so. Dkt. 9, at 14. I recently reminded Byrd of these instructions and I provided her with a second copy of the pretrial directions. Dkt. 75 and Dkt. 75-1. For some of DVA's proposed facts, Byrd simply fails to identify evidence of record that supports her alternate version. *See, e.g.*, Dkt. 76, at 4-5, 8-10, 13, 16-18, 20-22. For other facts, the evidence that Byrd cites does not actually support her alternate version. For still other facts, Byrd's "dispute" does not respond to the proposed fact, it merely offers tangential information. These same problems plague Byrd's own proposed findings of fact, Dkt. 81, most of which DVA has moved to strike. Byrd had ample warning that even though she is proceeding pro se, I would accept DVA's proposed facts as true if she failed to properly respond to them. Dkt. 9, at 11 and Dkt. 75-1, at 2. Thus, where the record does not obviously contradict DVA's proposed facts, I will accept those facts as undisputed. *See Yancick v. Hanna Steel Corp.*, 653 F.3d

2

532, 543-44 (7th Cir. 2011) ("[E]mployment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal citations and quotation marks omitted).

Byrd began working for DVA on October 12, 2010, and unless otherwise noted, all of the relevant events occurred in 2010. She was hired as a limited term employee, and her title was Operations Program Associate. Byrd worked for the State Approving Agency, a section of DVA's Bureau of Programs and Services Division. That agency evaluates, approves, and monitors educational institutions that receive federal funds for students attending under the GI Bill. During Byrd's employment, the agency had four other full-time employees: Nina Smithback, Roger Boeker, Nancy Warner, and Chris Schuldes. Smithback and Boeker were Education Consultants, who evaluated and monitored the educational institutions with which the office interacted. Warner was an Operations Program Associate, and she provided administrative support to the Education Consultants. Schuldes supervised the office, although he also had other duties elsewhere in DVA. Schuldes's predecessor was Joseph Bertalan, who hired Byrd but left his position shortly thereafter to pursue a different job within DVA. Bertalan's only interaction with the State Approving Agency during the relevant time period was to assist with drafting the annual contract between the agency and the United States Department of Veterans Affairs.

Byrd was hired to provide administrative support to the Education Consultants. Her responsibilities included providing technical assistance to approved institutions, composing and proof-reading letters, maintaining a database of all approved schools in Wisconsin, and performing research or completing other duties as assigned by Smithback and Boeker. During the first few weeks of her employment, the Education Consultants trained her on how to perform these duties. During this training, Boeker allegedly harassed Byrd by sitting too close to

3

her and pressing his arm against hers. In response, Byrd suggested to Boeker that they relocate her training sessions to the conference room, where there would be more space.

Later during Byrd's first week, Boeker went to Schuldes to inform him that Byrd was having difficulty completing the training. Schuldes called Byrd into his office. During their meeting, Byrd told Schuldes that she "was having a very difficult time working with Roger Boeker. And specifically . . . that the proximity of working with him was very harassing." Dkt. 49 (Byrd Dep. 94:2-5). Byrd requested that her training sessions be held in the conference room, rather than at her desk, and Schuldes approved the request.

In addition to the training sessions, Boeker had regular contact with Byrd when he retrieved files from Byrd's work area. Byrd alleges that when he did so, Boeker would shove his crotch and buttocks against her shoulder. Byrd also recounts comments that Boeker made about the way she smelled. The parties dispute what exactly Boeker said, but they agree that a DVA employee in a different (but connected) office, Gundy Metz, had allergies that could be triggered by strong fragrances or perfumes. DVA contends that Boeker relayed this information to Byrd and told her that the scent she wore was strong so she might want to "tone it down." Dkt. 87, at 23-24. Immediately after the incident, Byrd sent Boeker an e-mail. In pertinent part, she wrote:

> Hi Roger:
>
> I am responding to your comments a few minutes ago about you "noticed smelling me as I went by…"
>
> I want you to know that I thought your comments were highly inappropriate to me as a reference to "…Gundy's allergies…"

Dkt. 61-1, at 28 (alterations in original).

Byrd asked Schuldes if she could relocate her workspace. Schuldes agreed. But there was a miscommunication about moving Byrd's computer because IT personnel took the machine,

held it for three days, and then returned it to her original desk on October 27. Byrd moved the computer to the correct desk, and went to the IT employee responsible, Mark Soleimani, to inquire about his reasons for returning the computer to the wrong desk. Byrd and Soleimani returned to the office together where, according to Byrd, Soleimani became very hostile toward her. He took the computer from Byrd's new desk, returned it to her old cubicle, and yelled at her that she did not have the authority to move computer equipment. Byrd wrote an e-mail to Schuldes the next day, expressing her "concern . . . that Mark violated the WDVA's policy concerning violent behavior in the workplace. His conduct was very hostile, violent, and senseless." Dkt. 81-4, at 20.

Byrd had a second confrontation with Soleimani on October 29, this time because Byrd took it upon herself to move a computer speaker from another desk onto her own. In another e-mail to Schuldes, Byrd relayed that Soleimani had again been hostile, disrespectful, and rude toward her by saying that she did not have authority to move computer equipment. Byrd concluded her e-mail by stating "I have already submitted a Complaint to you regarding Mr. Soleimani whom I don't know and have never met except for his hostilities I've reported and I am reporting now. Please let me know if I should refer my Complaint regarding Mr. Soleimani to a higher authority within WDVA." *Id.* at 21.

Byrd's employment with DVA did not last long. She did not complete tasks on time and did not apply the training that Boeker and Smithback provided to her.[1] In addition, Boeker and

---

[1] Byrd attempts to dispute this appraisal of her performance by citing a status report that establishes that, in her words, "[t]he work accomplished by Ms. Byrd represented an enormous amount of work for Smithback, Boeker, Warner and Bertalan during Plaintiff's first week of work." Dkt. 76, at 5 (citing "EEOC Rebuttal Exhibit 4," which I assume to be Dkt. 81-4, at 6-7). But the report is just a list of projects that Byrd apparently created herself. It does not demonstrate that she performed tasks timely or according to her training. Thus, Byrd has failed to raise a genuine dispute of this fact.

Warner both received complaints from educational institutions regarding the tone and content of official correspondence from Byrd.[2] Finally, Byrd routinely focused on tasks or duties that were outside the scope of the administrative support position for which she was hired, despite instructions from Boeker and Schuldes not to do so. In his deposition, Boeker described Byrd's work as "unfocused, small volume, [and] infected with . . . opinion that was unsubstantiated by her level of experience." Dkt. 51 (Boeker Dep. 33:19-22).

Boeker and Smithback met with Schuldes on two occasions to discuss Byrd's performance: the first was during Byrd's second week of employment, and the second was on or around October 30. At the second meeting, Boeker and Smithback acknowledged that they had made a mistake in recommending that DVA hire Byrd, and that she was not following instructions, performing assigned tasks, meeting deadlines, or providing them with the administrative support that they needed. Schuldes then met with the Division Administrator, James Bond, and relayed the information that he had received from Boeker and Smithback. Schuldes recommended that Byrd's employment be terminated, and Bond agreed with the recommendation.

On November 1, Schuldes called Byrd into his office. In the presence of a human resources representative, he informed her that she was being fired, effective immediately. The decision was memorialized in a letter dated the same day from Amy Franke, DVA's Human Resources Manager. Dkt. 76-3. During the termination meeting with Schuldes, Byrd did not mention anything about sexual harassment or inappropriate physical contact from Boeker or

---

[2] Byrd attempts to disputes the veracity of these complaints by suggesting that she wrote letters at Boeker's instruction—a proposition for which she offers no evidentiary support, Dkt. 76, at 8—and by explaining that no DVA employee ever informed her that she had received complaints—a non-responsive argument. Thus, Byrd has failed to raise a genuine dispute of this fact.

any other DVA employee. Byrd wrote an e-mail to Schuldes the same day, in which she expressed her disappointment at being fired and criticized Schuldes for never discussing Soleimani's hostile behavior toward her.

Byrd filed a complaint with the Equal Employment Opportunity Commission on May 6, 2011. When the administrative process did not yield a satisfactory result, Byrd filed suit in this court under Title VII. She asserted claims for quid pro quo sexual harassment, hostile work environment, and retaliation. I have subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because they arise under federal law.

ANALYSIS

DVA has moved for summary judgment on all three of Byrd's claims. Summary judgment is appropriate if the moving party, here DVA, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and make all reasonable inferences in Byrd's favor, but as the non-moving party who will ultimately bear the burden of persuasion, she must "go beyond the pleadings and affirmatively demonstrate a genuine issue of material fact for trial." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). Byrd cannot avoid summary judgment on her claims if she "fails to demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [her] favor." *Id.*

DVA first contends that Byrd has not alleged or adduced evidence of quid pro quo harassment. DVA also contends that Byrd cannot succeed on a hostile work environment claim because there is no basis for imputing liability to her employer. As to the retaliation claim, DVA

7

asserts that Byrd did not engage in any protected activity and, even if she did, there is no evidence that Byrd's activity caused her termination. In addition to its motion for summary judgment, DVA has renewed an earlier motion to dismiss this case as a sanction for Byrd's discovery violations.

Byrd directly confronts only a few of DVA's arguments in support of summary judgment; most of her opposition consists of boilerplate statements of Title VII law. *See generally* Dkt. 80. She asserts, however, that DVA is not entitled to summary judgment on any of her claims. She opposes DVA's motion to dismiss with the argument that DVA has committed discovery violations, not her. Byrd's arguments are not persuasive, although I will not grant DVA's motion to dismiss as a discovery sanction. I conclude that DVA is entitled to judgment as a matter of law on her quid pro quo and retaliation claims. Byrd has adduced some evidence in support of her hostile work environment claim, but I will give DVA an opportunity to respond to that evidence before allowing Byrd to proceed on that claim.

**A. Quid pro quo harassment**

DVA is entitled to summary judgment on Byrd's quid pro quo harassment claim. This type of "harassment occurs in situations where submission to sexual demands is made a condition of tangible employment benefits." *Bryson v. Chi. State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996); *see also Holtz v. Marcus Theatres Corp.*, 31 F. Supp. 2d 1139, 1147 (E.D. Wis. 1999); 29 C.F.R. § 1604.11(a) (EEOC definition of sexual harassment). To prove quid pro quo harassment, Byrd must demonstrate that (1) "she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established." *Bryson*, 96 F.3d at 915. Discovery has failed to yield evidence from which a jury could conclude that the fourth of these elements is satisfied.

Byrd's quid pro quo claim was doomed almost from the outset. Aside from a conclusory allegation that Boeker's conduct amounted to quid pro quo harassment, Dkt. 1, ¶ 28, the complaint does not allege any link between Boeker's advances and a tangible employment benefit. According to the Supreme Court, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The only tangible employment action that Byrd alleges occurred in this case is her termination. Dkt. 1, ¶ 27. But she does not allege that Boeker threatened her with termination if she refused his advances, or that he conditioned her continued employment on her acceptance of those advances.

More importantly, Byrd has not adduced evidence of such a connection through discovery. *See Wenner v. C.G. Bretting Mfg. Co.*, 917 F. Supp. 640, 646 (W.D. Wis. 1995) ("[P]laintiff has adduced no evidence suggesting that defendant intended that his continued employment or his chances of advancement be conditioned upon his submission to the unwelcome sexual advances . . . defendant is entitled to judgment as a matter of law on this claim."). Byrd's proposed facts indicate that Boeker sexually harassed her through inappropriate touching and through comments about the way she smelled. But that is all. Indeed, even the narrative in Byrd's brief in opposition does not describe any instances of Boeker conditioning an employment benefit on Byrd's acceptance of his advances. Dkt. 80, at 3-11. Because she has no evidence to support an element of her claim of quid pro quo harassment, summary judgment for DVA is required.

**B. Hostile work environment**

Although Byrd does not make it clear in her brief, the court sees evidence in the record that would support her hostile work environment claim. But because the court has identified

this evidence, I will give DVA an opportunity to be heard before I rule definitively that DVA is not entitled to summary judgment on this claim.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To prevail on such a claim, Byrd must demonstrate that: (1) the work environment was both subjectively and objectively offensive; (2) her gender was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there was a basis for employer liability. *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir.) *cert. denied,* 135 S. Ct. 159 (2014); *see also Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). DVA contends that Byrd has failed to adduce evidence of a basis for imputing liability to her employer.[3] But the parties must clarify the state of the record before I can determine whether there is a dispute of fact as to DVA's negligence in failing to respond to the harassment that Byrd reported to her supervisor, or in failing to discover other unreported harassment.

As a threshold issue, only some of Byrd's allegations discuss actionable sexual harassment. Byrd contends that "[d]uring [her] employment, she was subjected to a very hostile work environment caused by Mark Soleimani, Roger Boeker, Nina Smithback, Chris Schuldes and Joe Bertalan." Dkt. 80, at 12. But she misunderstands the scope of Title VII's protections. Standoffish, rude, or unprofessional behavior from coworkers does not amount to actionable hostile work environment harassment because Title VII is not a general civility code. *Faragher v.*

---

[3] DVA proposes that I first separate out conduct that does not amount to severe harassment. Dkt. 60, at 13-16. But this approach contradicts the Seventh Circuit's "directive that courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chi.*, 713 F.3d 325, 331 (7th Cir. 2013) (internal citations and quotation marks omitted). Accordingly, DVA's argument that some of Boeker's conduct was not objectively severe—and therefore cannot support Byrd's hostile work environment claim—is a non-starter.

10

*City of Boca Raton*, 524 U.S. 775, 788 (1998); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009). Thus, for example, Byrd's allegations regarding Soleimani do not support a claim for harassment under Title VII because Byrd has failed to adduce evidence that his hostility toward her was on account of her gender. Likewise, there is no evidence that Byrd suffered sexual harassment at the hands of Smithback, Bertalan, or Schuldes.

At issue in this case is whether Boeker's conduct toward Byrd created a hostile work environment and, if so, whether there is a basis for imputing liability for that conduct to DVA. Byrd alleges three behaviors that amount to sexual harassment under Title VII. She recounts that Boeker sat too close to her during training and rubbed his arm against hers; made comments about her perfume and the way that she smelled; and rubbed his crotch and buttocks against her while she was at her desk. Byrd has adduced admissible evidence of each of these behaviors—her own testimony, corroborated in part by her emails—and, if the jury believes Byrd, it could conclude that this conduct is so severe or persuasive as to constitute a hostile work environment.

But Byrd also needs to establish a basis for holding DVA liable for this conduct. The initial question is whether Boeker was Byrd's supervisor. I conclude that he was not, and so DVA can be liable for Boeker's conduct only if DVA was negligent in failing to discover or correct it. Byrd's case is not a strong one, but the court sees evidence in the record that would be minimally sufficient to show that DVA was on notice of potential sexual harassment that it did not reasonably investigate and address.

### 1. Byrd's supervisor

The standard for employer liability varies depending on the status of the alleged harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). When the harassing employee is a supervisor, the employer is strictly liable if the harassment culminates in a tangible employment

action. *Id.* But when the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in discovering or remedying the harassment. *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012). In *Vance v. Ball State University*, the Supreme Court held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." 133 S. Ct. at 2439. The Court explained that a supervisor has the ability "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443. In this case, the undisputed facts show that Schuldes—but not Boeker—was Byrd's supervisor, as the term is defined for Title VII purposes.

According to DVA's Human Resources Manager, Boeker did not have the authority to hire, fire, promote, transfer, or discipline DVA employees. Dkt. 59, ¶ 6. Byrd does not contend that she believed that Boeker could hire or fire her, although even if she did, her subjective belief would be insufficient in light of the record evidence. *Williamson v. Graphic 22, Inc.*, No. 11-cv-336, 2014 WL 3579681, at *17 (N.D. Ind. July 21, 2014) (citing *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 10 (1st Cir. 2011)); *see also Bombaci v. Journal Cmty. Pub. Grp., Inc.*, 482 F.3d 979, 985 (7th Cir. 2007) ("Though Bombaci and other employees stated that they believed that Stoll was a supervisor, Bombaci has offered no evidence that this belief was reasonable in light of Stoll's duties."). Instead, Byrd implies that Boeker was her "immediate supervisor," Dkt. 80, at 3, because he assigned work to her, trained her, was on the panel that interviewed her, and was involved in recommending her termination.

Byrd conflates the colloquial meaning of "supervisor" with the term's legal definition. To use different vernacular, Boeker may have been Byrd's "boss," but he was not her "supervisor," for purposes of Title VII. As the Supreme Court has explained, "[t]he ability to direct another

12

employee's tasks is simply not sufficient" to support vicarious liability for the directing employee's actions. *Vance*, 133 S. Ct. at 2448; *see also Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) ("[A]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context."). Moreover, Boeker's participation in the panel that interviewed Byrd, and his later recommendation to Schuldes that her employment be terminated, does not elevate him to a supervisor. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). Because the evidence of record establishes that DVA did not empower Boeker to take tangible employment actions against Byrd, there is no dispute that he was not Byrd's supervisor.

This leaves Schuldes. Byrd does not dispute that he had the power to hire, fire, and discipline her, and the power to change the conditions of her employment. Dkt. 76, at 3. Schuldes met with Byrd to discuss her performance on at least one occasion, and he led the meeting in which she was terminated. Byrd does not argue, and the record does not support, that Schuldes delegated his power to take tangible employment actions to other employees. *See Vance*, 133 S. Ct. at 2452. Thus, in this case, Schuldes was Byrd's supervisor for Title VII purposes.

### 2.  Basis for employer liability

Because Byrd alleges harassment from a co-worker, DVA can be liable for Boeker's conduct only if it was negligent in failing to discover or remedy it. The evidence of record confirms that DVA, through Schuldes, responded appropriately to Byrd's first report that Boeker was sitting too close to her during training.

The Seventh Circuit does "not consider an employer to be apprised of the harassment 'unless the employee makes a concerted effort to inform the employer that a problem exists.'" *Rhodes*, 359 F.3d at 506 (quoting *Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999)). Even

13

when so apprised, "[a]n employer satisfies its legal duty in coworker harassment cases if it takes reasonable steps to discover and rectify acts of harassment of its employees." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (internal citations and quotation marks omitted). Here, Byrd complained to Schuldes that Boeker was sitting too close to her during training. Dkt. 49 (Bryd Dep. 20:16-17; 93:9-10). But she offered a specific solution to the problem—training in the conference room—and the parties agree that Schuldes granted Byrd's request. "In assessing the corrective action, our focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps *to prevent future harm*." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 637 (7th Cir. 2009) (emphasis added). Byrd does not dispute that Schuldes gave her the *exact* solution that she proposed, nor has she adduced evidence that she later returned to Schuldes to complain that relocating had failed to fix the problem with Boeker's training. Under these circumstances, no jury could conclude that Schuldes's response to Byrd's first complaint was unreasonable.

Byrd admits that she never informed Schuldes that Boeker was pressing his crotch and buttocks against her when he came into her cubicle. Dkt. 49 (Byrd Dep. 24:11-13; 93:19-94:8). But perhaps DVA should have been more diligent in investigating Byrd's claims of sexual harassment. Neither party pointed this out in briefing, but during her deposition, Byrd alluded to a second e-mail that she sent to Boeker and, importantly, stated that she copied Schuldes on it. *Id.* (Byrd Dep. 27:4-29:18). Byrd acknowledged that she had not seen the e-mail recently, although she described the contents of the communication as "specific to the degree that I reported to Roger Boeker that he led me down a hallway just to harass me about perfume I didn't wear." *Id.* (Byrd Dep. 29:9-12). Byrd's uncorroborated deposition testimony might not be very convincing, but the persuasiveness of her evidence is not a consideration on summary judgment.

14

Neither party docketed a copy of this e-mail (at least, neither party directed me to it). Moreover, DVA's brief in support did not address whether this communication triggered a duty to reasonably respond to Byrd's accusations, or to investigate other instances of harassment. *See Zimmerman v. Cook Cnty. Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996) ("[S]he cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed."). If Schuldes was negligent in failing to respond to or investigate her allegation that Boeker harassed her about the way she smelled, that would provide a basis for imputing liability for Boeker's conduct to DVA. *See Jajeh*, 678 F.3d at 569. I will not rule definitively on DVA's motion for summary judgment on Byrd's hostile work environment claim without affording DVA an opportunity to respond to this evidence.

## C. Retaliation

Finally, DVA is entitled to summary judgment on Byrd's retaliation claim. There are two ways in which Byrd can prove retaliation. First, under the "direct method," she can show that "(1) [she] engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) [there is] a causal link exists between the two." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013). Alternatively, under the "indirect method," Byrd must show that "(1) [she] engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* (internal citations omitted). Byrd's brief in opposition includes boilerplate statements about both methods, but does not indicate which method she is pursuing in this case. Dkt. 80, at 13-14. In light of her pro se status, I will analyze whether she can proceed under either method. But ultimately, Byrd's retaliation claim fails at the final element of both

15

approaches: she has not adduced evidence of a causal connection, and she has not adduced evidence that similarly situated employees received better treatment than she did. Summary judgment is therefore appropriate.

A jury could reasonably conclude that some of Byrd's reports to Schuldes qualify as protected activity.[4] Byrd specifically recounts telling Schuldes that Boeker was harassing her during training by sitting too close to her, Dkt. 49 (Byrd Dep. 20:16-17). Internal complaints to supervisors can amount to protected activity, provided that they recount discrimination on the basis of sex. *Tomanovich*, 457 F.3d at 663; *Wilcox v. Allstate Corp.*, No. 11-cv-814, 2012 WL 6569729, at *14 (N.D. Ill. Dec. 17, 2012) ("Title VII gives plaintiffs flexibility with respect to the format of the complaint; statutorily protected activity can range from filing formal charges to voicing informal complaints to superiors."). Here, there is a dispute of fact as to what specifically Byrd said to Schuldes during their meeting and in her e-mail. But she generally indicated that Boeker was sitting too close to her and pressing his arm against hers during training. At this point, a jury could conclude that she used adequately direct language to alert him that she was complaining of unlawful sexual harassment. Thus, Byrd has adduced sufficient evidence that she engaged in protected activity.

Protected activity is not enough, however, and Byrd must adduce evidence of a causal connection between her complaints and her termination. Under the direct method, Byrd can show a causal connection with either direct or circumstantial evidence. "[D]irect evidence essentially requires an admission by the decision maker that his actions were based on the prohibited animus and so is rarely present. . . . But circumstantial evidence can establish a causal

---

[4] Byrd's complaints about Soleimani do not qualify as protected activity because Byrd did indicate that he was hostile to her on account of her gender. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").

link if the trier of fact can *infer* intentional discrimination." *Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005) (original emphasis) (internal citations and quotation marks omitted). The record does not contain direct evidence of retaliatory animus, and thus, Byrd must rely on circumstantial evidence.

In retaliation cases, "circumstantial evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Here, Byrd principally relies on suspicious timing. True, the timeline of relevant events is not at all clear. But Byrd's employment lasted only three weeks, and so her termination necessarily followed closely on the heels of any protected activity in which she engaged. Of course, the Seventh Circuit has consistently held that "[u]nder most circumstances, suspicious timing alone does not create a triable issue on causation." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014); *see also Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (discussing the "general rule"); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Thus, whether the chronology of events in this case is sufficient to allow a jury to find evidence of causation turns on what other circumstantial evidence Byrd has adduced. Unfortunately for Byrd, there is simply no other evidence in the record that, even if combined with suspicious timing, could lead a jury to find in her favor.

According to DVA, Byrd was terminated because she was not adequately performing assigned tasks or adequately supporting Boeker and Smithback. Byrd's subjective disagreement with this assessment is not evidence of pretext. *See Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about his ability, however, are insufficient to contradict an employer's negative assessment of that ability."); *St. Louis v. Am. Family Mut. Ins. Co.*, 300 F. Supp. 2d 813, 826 (W.D. Wis. 2003) *aff'd* 121 F. App'x 660 (7th

Cir. 2005). Byrd does not direct the court to record evidence that Boeker and Smithback lied about her performance when they recommended that Schuldes terminate her, nor does she contend that Schuldes did not honestly believe that she was failing to perform her duties when he sought approval to fire her. In short, Byrd has not adduced evidence of pretext.

Finally, there is no evidence in the record that similarly situated employees who did not engage in protected activity received better treatment than Byrd did. The closest evidence that Byrd has is one proposed finding of fact, which discusses a former DVA employee. Specifically, Byrd proposed that "[t]he Wisconsin Department of Veterans Affairs allowed Amy Lorimer, a former LTE, to work a maximum of *four years* while failing to perform her job duties." Dkt. 81, ¶ 41 (original emphasis). DVA admits that Lorimer was a former LTE who worked part-time between 2007 and 2011, and that she was not able to meet the job qualifications. Dkt. 86, at 19. And although Byrd does not advance any legal argument regarding similarly situated employees, I infer that she proposed this fact as evidence of a causal connection between her report to Schuldes and her termination. Her argument appears to be that DVA allowed Lorimer to remain employed for four years, despite the fact that she performed her job poorly. But no jury could view the evidence from which the fact is derived and conclude that Lorimer received better treatment than Byrd did.

Byrd relied, exclusively, on Bertalan's deposition testimony to support her proposed fact. In pertinent part, Bertalan testified:

> Q: Now, are you familiar with an employee named Amy Loramer?
> A: Yes.
> Q: Was she an LTE for some period of time?
> A: Yes.
> Q: Was she an LTE in the 2007 timeframe?
> A: I don't recall exactly.
> Q: Was her job title similar to Anders' job title as someone who assisted the education consultants?
> A: Yes.

18

Q: Is it correct she served as an LTE around 2007 through 2011?
A: Yes.
Q: But she was under the six-month limitation. Is it correct that after every six months, you would find some way, however you did it, to retain her as an LTE?
A: I think in that case it's six months; but if you don't use the number of hours that would be worked in that six-month period, then it could go beyond it, as I recall it.
Q: I see.
A: It's been three or four years since I've been involved.
Q: But she was in this LTE position for at least a four-year period?
A: Yes.
Q: Did she just not use up the roughly 1,000 hours or so as an LTE within that four-year period?
A: As I recall.
Q: I think the record would show that she left in January of 2011. Do you know why she left?
A: She was not able to meet the job qualifications.
Q: Was it a job performance issue then?
A: Yes. We needed more than she could provide.

Dkt. 50 (Bertalan Dep. 11:13-12:22). Accepting Byrd's implicit contention that Lorimer was similarly situated would require several significant and unreasonable inferences. First, this evidence does not confirm that Lorimer was directly comparable to Byrd "in all material respects." *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Lorimer and Byrd were both limited term employees, but Bertalan did not provide specifics as to Lorimer's duties, her supervisors, or her qualifications. Second, the deposition testimony does not establish whether Lorimer ever engaged in protected activity—a crucial prerequisite for would-be comparators. Finally, Bertalan did not testify that Lorimer was failing to perform her duties for *the duration* of her employment, only that she left because she could not meet the job qualifications. At this point in the case, Byrd is not entitled to every possible inference in her favor; just those that are *reasonable*. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). And it is simply not reasonable to augment this snippet of deposition testimony

with the factual speculation that would be necessary to elevate it to evidence of a similarly situated employee who received better treatment than Byrd did.

With no ambiguous statements of animus, no similarly situated employees, or no reason to doubt that DVA's decision makers believed the reasons they had for firing Byrd, suspicious timing is the only circumstantial evidence of a causal connection between Byrd's protected activity and her termination. Such evidence is insufficient to create a genuine dispute of fact as to whether Byrd's reports of sexual harassment led to her termination. Thus, Byrd cannot proceed under the direct method.

Byrd also cannot proceed under the indirect method, an essential element of which is that similarly situated employees were treated better than she was. In this case, Byrd has not adduced evidence of any similarly situated employees. She therefore cannot make the required prima facie showing under the indirect method. And even if she could, the same absence of circumstantial evidence of a causal connection would doom her claim at the pretext step of the indirect method. *See Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (outlining the burden-shifting approach of the indirect method). The evidence of record establishes that Byrd cannot prove her claim of retaliation through the direct method or through the indirect method. DVA is therefore entitled to summary judgment.

### D.  DVA's motion to dismiss

DVA has also moved to dismiss Byrd's case as a sanction for her conduct during discovery. Dkt. 68. I will deny this motion.

At various points throughout this case, Byrd hindered the discovery process. She initially refused to provide adequate answers to interrogatories and requests for production, which led her attorney to move to withdraw and left her to prosecute this case pro se. Dkt. 10. Even after driving an attorney away, Byrd's conduct did not improve. She continued to resist DVA's

legitimate discovery requests and she was generally uncooperative during her deposition, refusing to answer perfectly appropriate questions.

I have afforded Byrd considerable leniency because she is representing herself. But her actions have necessitated multiple discovery-related motions and adjustments to the schedule for this case. DVA has already moved once to dismiss as a sanction for Byrd's discovery violations, Dkt. 39, and in denying that motion I expressly warned Byrd that if she failed to provide full responses to DVA's interrogatories and requests for documents, then I would dismiss her case with prejudice, Dkt. 45, at 3.

DVA now contends that Byrd was untruthful in her answers to its interrogatories. The relevant questions concern Byrd's former employer and allegations of harassment that she made while employed there. According to DVA, this information is relevant, admissible, and goes directly to Byrd's credibility and reputation for truthfulness. In terms of prejudice, DVA asserts that Byrd's untruthful answers now require it to depose one or more of Byrd's former supervisors or co-workers, and that she has generally hindered its ability to prepare a defense in this case.

"[D]ismissal is a harsh penalty [and] an action may be dismissed only when there is a clear record of delay or contumacious conduct, or prior failed sanctions." *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009) (internal citations and quotation marks omitted). I agree that Byrd has been uncooperative throughout this case, even in the face of explicit court orders correcting her behavior. She has, however, put forth at least some effort to comply with her discovery obligations. She answered DVA's interrogatories, attended her deposition, and generally answered DVA's questions. If her answers were untruthful, or if she claimed to have no knowledge of events that she obviously experienced first-hand, then DVA is free to use this evidence to impeach Byrd's credibility. Moreover, I will not permit Byrd to introduce her own

evidence of events for which she has now disavowed any knowledge. But DVA has not shown that prior sanctions were ineffective (indeed, Byrd has not received any prior sanctions), that lesser sanctions would be inadequate now, or that Byrd has so steadfastly frustrated discovery so as to make dismissal appropriate in this case. I will therefore deny DVA's motion to dismiss.

## ORDER

IT IS ORDERED that:

1. Defendant Department of Veterans Affairs's motion for summary judgment, Dkt. 53, is GRANTED in part. Defendant is entitled to summary judgment on plaintiff Rose Byrd's quid pro quo harassment and retaliation claims.

2. The remainder of defendant's motion for summary judgment is DEFERRED. Defendant may provide supplemental briefing and evidence to respond to the issue of whether, in light of Byrd's deposition testimony about her email about Boeker's conduct, DVA was negligent in failing to respond to or investigate allegations of sexual harassment. Defendant's submission is due on April 10, 2015.

3. Defendant's motion to dismiss, Dkt. 68, is DENIED.

4. The court will hold a telephonic status conference at 3:00 p.m. on April 7, 2015, to consider any remaining issues and to ensure that the case is ready for trial on May 11, 2015.

Entered April 3, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge